**CHURCH OF SPIRITUAL TECHNOLOGY,**
*Plaintiff,*

v.

**The UNITED STATES, Defendant.**

**No. 581–88T.**

United States Claims Court.

June 29, 1992.[1]

---

1. The opinion of May 26, 1992, was vacated and corrections were made pursuant to the Order on Reconsideration of June 29, 1992.

Monique E. Yingling, Washington D.C., for plaintiff. Thomas C. Spring, of counsel.

W.C. Rapp, with whom were Asst. Atty. Gen., Shirley D. Peterson and David Gustafson, for defendant.

## OPINION

BRUGGINK, Judge.

This is an appeal from a decision rendered by the Commissioner of the Internal Revenue Service ("IRS"). The Church of Spiritual Technology ("CST"),[2] plaintiff, applied for tax-exempt status under I.R.C. § 501(c)(3) (1982) as a religious organization.[3] On July 8, 1988, the IRS issued its final adverse ruling denying CST's bid for tax exemption. CST appealed that administrative decision to the court pursuant to

I.R.C. § 7428(a), resulting in the instant case.

The IRS denied CST's application because the organization failed to establish that it was operated exclusively for exempt purposes. The IRS found that CST was operated for the benefit of the private interests of the founder of the religion of Scientology, L. Ron Hubbard, up until his death, and that subsequently it was operated for the substantial non-exempt purpose of aiding other Scientology organizations in their marketing of Scientology services and publications.

After consideration of the issues presented, and for the reasons that follow, the court concludes that the CST has not carried its burden of establishing that the Commissioner's decision was incorrect. It has not demonstrated that it is operated exclusively for tax-exempt purposes. The administrative record persuades the court that CST was founded for the primary purpose of gaining tax-exempt status to serve the financial goals of other, non-exempt entities, and that CST's archiving activities are secondary to its obtaining a tax exemption and would not of themselves qualify CST as a tax-exempt organization under I.R.C. § 501(c)(3).

## I. FACTS

### A. *History and Tenets of Scientology*

In 1950, L. Ron Hubbard ("LRH") founded the church of Scientology based on a new science he had created that he termed "Dianetics." The first Scientology church was incorporated in 1954. Since its founding, Scientology has grown and expanded into a complex hierarchy of related churches and organizations. Each entity has a specific place in the ecclesiastical scheme of Scientology as a whole. LRH died in 1986, but his writings and other recorded words are still considered to be scripture by adherents of Scientology.

---

**2.** A list of the acronyms used throughout this opinion is attached as an appendix.

**3.** Treasury Regulation § 1.501(c)(3)–1(d)(1)(i) states that an organization may be exempt if its

exclusive purpose is religious, charitable, scientific, testing for public safety, literary, educational or prevention of cruelty to children or animals.

Scientology is based on a belief that man is an immortal spirit who has lived through previous lifetimes. Plaintiff describes the goal of Scientology as "a civilization without insanity, without criminals and without war, where the able can prosper and honest beings can have rights, and where Man is free to rise to greater heights." Defendant's Proposed Finding of Fact ("DPFF") 6.

Scientology hopes to achieve this goal through its sacrament of "auditing." Through this process the person or "preclear" is "cleared" of problems and behaviors caused by his "reactive mind." The reactive mind is the term used by Scientologists to describe a force that causes a person to act irrationally or against his own best interest. Scientology seeks to allow a person to overcome his unknowing obedience to the reactive mind, help him to clear himself of its influence, and make him responsible for his actions. When a person becomes clear, he achieves freedom from unwanted burdens, and becomes certain of immortality. The concept of immortality and previous lives is behind Scientologists' desire to preserve the words of LRH for billions of years.

Providing auditing services is the chief function of "Class IV" churches.[4] It is the responsibility of these churches to bring new members into Scientology, and to provide them with basic Scientology services. As a person moves along in the auditing process, he becomes eligible to receive services from the higher level churches. Higher level services must be provided by a church higher up in the hierarchy because they involve the "Advanced Technology" of Scientology. Plaintiff describes this as "[t]he portion of the Scientology scriptures that constitutes the upper levels of spiritual awareness in the Scientology faith." Plaintiff's Proposed Finding of Fact ("PPFF") 8. The Advanced Technology is what might be thought of as the revealed wisdom of Scientology. Access to it is heavily guarded and is granted only to those parishioners who have completed a specified number of auditing courses and progressed to a certain level in Scientology training. Before one is allowed access to Advanced Technology, one must agree not to share it with anyone still in the lower levels of Scientology.

All auditing services, of whatever level, must be purchased for cash by the recipient according to a scale of "fixed donations," or "fixed contributions." Scientology scriptures discuss the "Doctrine of Exchange" or the need to "balance inflow with outflow." Payment for auditing is explained as a requirement of this doctrine. Although characterized by taxpayers as a religious contribution, the Supreme Court has held that payments for Scientology auditing services do not generate a tax deduction for the individual taxpayer.[5]

Scientology scriptures also discuss at length the error of allowing the public to pay on credit, or of selling auditing for less than full price. In Hubbard Communications Office ("HCO") Policy Letter of April 27, 1965, LRH cautions, "The tendency then against which we must guard is covert lowering of prices once set."

### B. Organization of Scientology Hierarchy

For reasons discussed below, the court concludes that the Commissioner properly viewed CST's petition in the context of Scientology as a whole. It is necessary, therefore, to describe that wider structure from an organizational standpoint.

Scientology has undergone almost constant corporate metamorphosis since its creation. In order to try to untangle the current structure and put it in proper perspective, we begin with the state of affairs prior to 1981, when the latest reorganization impetus arose. Before 1981, the Church of Scientology of California ("CSC") acted as the mother church for all of Scientology. It was organized as a nonprofit corporation in California, and was responsible for running all aspects of Scientology with the exception of some spe-

---

4. See discussion infra p. 729.

5. Hernandez v. Commissioner, 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989).

cialized financial arrangements. It had ultimate ecclesiastical authority, provided all levels of Scientology services, and was the center of management for all other Scientology organizations. CSC was founded in 1954 and was recognized, for a time, as tax-exempt by the IRS. The IRS issued a letter revoking the tax-exempt status of CSC in 1967. Thus began a lengthy investigation of CSC and other affiliated organizations. The IRS issued a notice of deficiency in 1977, CSC appealed this decision to the Tax Court and the matter was tried. Although the Tax Court did not issue its ruling until 1984, *Church of Scientology of California v. Commissioner*, 83 T.C. 381 (1984), *aff'd*, 823 F.2d 1310 (9th Cir.1987), *and cert. denied*, 486 U.S. 1015, 108 S.Ct. 1752, 100 L.Ed.2d 214 (1988), by 1981, CSC would certainly have realized that its tax-exempt status was in doubt.

In 1981, several high-ranking Scientology officials undertook a Mission Corporate Category Sort-out ("MCCS") to develop a new corporate structure for Scientology. The court does not know exactly what was discussed at the meetings although the meetings were recorded on audiotape. During the administrative process, the IRS requested on at least three occasions that CST produce the tapes. CST refused on the grounds that it did not have access to them, and that the tapes were in any case irrelevant to CST's tax-exempt status. The tapes had been put under a protective order by the Superior Court for the County for Los Angeles in a case involving CSC and a former Scientology employee.[6] The IRS issued a summons to the Clerk of the Los Angeles court to produce the tapes in connection with the investigation of CSC. CSC intervened in the suit asserting that the tapes were protected by the attorney-client privilege. The Ninth Circuit, which heard the case on appeal, reviewed the tapes and held that they contained evidence of intent to defraud the IRS, and thus were not protected by the attorney-client privilege.[7] This decision was issued during the present action. CST still did not produce the tapes claiming the MCCS discussions were abandoned in June of 1981, and that no action was taken with regard to anything the committee discussed.[8]

Nonetheless, shortly after the talks ended in 1981, Scientology underwent a reorganization. The goal of the new structure was for Scientology to "simplify its corporate structure."[9] CSC was broken up and

---

6. *Church of Scientology of California v. Armstrong*, No. 420153, (Super.Ct. Los Angeles 1984).

7. *United States v. Zolin*, 905 F.2d 1344 (9th Cir. 1990), *cert. denied, Church of Scientology v. United States*, — U.S. —, 111 S.Ct. 1309, 113 L.Ed.2d 244 (1991).

8. CST opposed the court's suggestion that the tapes be made part of the record here, but finally agreed, one month after oral argument, to make a transcript available to the court. Before CST would produce the transcript, however, the court had to agree that the transcript would be kept under seal, and further, that neither the transcript, nor any "commentary about it ... [would] become part of the public record." The court declines the offer, but makes two observations about it. First, it shows that CST has access to the tapes. Second, if the court were to comment on the transcript in this opinion, the offer contemplates that this opinion itself would not be accessible to the public.

9. After the church was "simplified," the record suggests that at least the following organizations constitute the church of Scientology: Founding Church of Scientology; Church of Scientology International; Religious Technology Center [including the Authorization, Verification and Correction Unit]; Church of Spiritual Technology; 129 Missions of Scientology, governed by Scientology Missions International; Church of Scientology Celebrity Centre International; 141 Class IV churches [local organizations such as the Church of Scientology of Portland or the Church of Scientology of San Francisco]; Continental Liaison Offices [known as CLOs]; Saint Hill Organizations; Church of Scientology Flag Service Organization; Flag Land Base; Flag Estates Org; Flag Command Bureaux [including Compilations Unit, LRH Artist, International Training School, New World Corps, Strategic Book Marketing Unit]; International Hubbard Ecclesiastic League of Pastors [known as IHELP]; Sea Organization Officer Council; the American Saint Hill Organization; Advanced Organization Los Angeles; Golden Era Studios; Watchdog Committee; the Commodore's Messenger Organization International; the Executive Director International; the Senior Executive Strata; the International Network of Computer Organized Management; World Institute of Scientology Enterprises; Golden Era Productions; Office of Special Affairs International;

replaced by several new higher-level entities. Church of Scientology International ("CSI"), Religious Technology Center ("RTC"), Church of Scientology San Francisco, and Church of Scientology Los Angeles were all products of the reorganization. CSI, RTC and CST, which was created in 1982,[10] are all what the court will refer to as "management churches."[11] The management churches collect money sent to them from the missions and Class IV churches. CSI became the new mother church of Scientology. It sits at the top of a complex corporate hierarchy. RTC is the entity charged with maintaining doctrinal purity in the church. CSI along with RTC form the top-level ecclesiastical management of Scientology, although there are numerous other churches and other entities that have a role in management, finance or spiritual affairs. The Church of Scientology Flag Service Organization, another of the management churches, delivers the highest level of Scientology services, training, and auditing. Ecclesiastical oversight is accomplished by CSI through the Watchdog Committee ("WDC"). This committee is responsible for oversight of the international ecclesiastical management structure of Scientology organizations.

The four Saint Hill[12] Organizations are the first step down from the management level churches in the Scientology hierarchy. They primarily train auditors. Next are the 141 Class IV Churches which deliver lower and intermediate level church services and are authorized to ordain ministers. Class IV churches are so called because the most advanced auditors there have progressed to Class IV of auditor training.[13] Class IV churches are subordinate to Continental Liaison Officers ("CLOs"). CLOs answer to the ecclesiastical authority of RTC and CSI.

The base of the church is formed by the Missions of Scientology, of which there are 129. These only provide the lower levels of Scientology services. Missions do not have the authority to ordain ministers. Scientology Missions have no ecclesiastical authority and are under the total control of Scientology Missions International.

The multiple layers of hierarchy thus create two different operational levels. The first is the management churches, which make all organizational decisions. The second is made up of Scientology Missions and the Class IV churches, which deal with the public and deliver Scientology's religious services. It is this second level which the public would perceive as the "church" of Scientology. It carries out the work and fulfills the spiritual purpose discussed in Scientology scriptures. With one exception, all of the 14 Scientology churches that have received tax-exempt status have been this type of local, Class

---

Bridge Publications; LRH Public Relations International; Household Unit; Inspector General Network [comprised of the Trademark Integrity Division and the Qualifications Division]; the United States Scientology Films Trust; International Scientology Films Trust; Author Services Inc., Cancorp, Religious Research Foundation; International Association of Scientologists; Church of Scientology Religious Trust.

**10.** For a discussion of CST's place in Scientology hierarchy, see *infra* pp. 730–32.

**11.** Scientology materials refer to the organizations which are in charge of ecclesiastical and administrative affairs as "Advanced Organizations" and explains that "Advanced Organizations deal in the upper level of [Operating Thetans]. They are staffed with Sea Org members. They have direct lines to Flag." L. Ron Hubbard, *Modern Management Technology Defined* 12 (1976).

**12.** Saint Hill was the name used for the English manor house purchased by LRH in 1959 which served as Scientology's headquarters. The Hubbard Communications Office was moved there in 1959 from its previous location in London. The office was the source of all Policy Letters issued by LRH. Policy letters, considered part of the Scientology scriptures, covered subjects ranging from proper management technique, to dealing with government agencies, to maintaining a sufficient level of income in all Scientology organizations. LRH also used Saint Hill as a place where those training to become Scientology ministers could live while receiving training. LRH sold the Saint Hill facility to the Church of Scientology of California in 1966. *Church of Scientology of California v. Commissioner,* 83 T.C. 381, 494 (1984).

**13.** The Class levels extend up to Class XII. L. Ron Hubbard, *Modern Management Technology Defined* 82 (1976).

IV church.[14] In contrast to the Class IV churches, these management churches and the original head church, CSC, have often had on-going conflicts with the IRS. Either their tax-exempt status has been revoked, or it has been denied in the first instance.

After carefully examining the record and attempting to understand the nominal corporate structure of Scientology it is apparent to the court that it is something of a *deceptis visus*. Real control is exercised less formally, but more tangibly, through an unincorporated association, the Sea Organization, more commonly referred to as the Sea Org. This group, in the nature of a fraternity or clan, began with Scientologists who pledged themselves eternally to Scientology and who accompanied LRH in his sea-going spiritual research in the Mediterranean. In 1967, LRH and other Scientology staff moved onto a yacht, the *Apollo*, "to pursue [LRH's] research of the upper levels of spiritual awareness." LRH and his *Apollo* staff performed Scientology services, managed the Scientology organization, and conducted spiritual research. If LRH could have been compared to Achilles, members of the Sea Org would have been his Myrmidons.

The Sea Org appellation survives in Scientology as a distinction afforded to those Scientologists who have dedicated themselves to serving Scientology for the next billion years. It is described by CST as a way to distinguish Scientologists worthy of great deference and respect. Sea Org members are initiates into the highest levels of Scientology, and bear concomitant responsibilities.

CST staff and officers are required to be members of the Sea Org, which gives CST the distinction of being a Sea Org Church. CSI, RTC, the Flag Service Org (which employs over 900 Sea Org members), the Saint Hill Churches, in short, all high ranking organizations are Sea Org Churches. Being a "Sea Org Church" means that the church's function is important enough to Scientology to warrant the attention of a significant number of Sea Org members.

Sea Org rank nominally carries with it no ecclesiastical authority in the sense that Sea Org members still take orders from the ecclesiastical leaders of whichever Scientology organization they join. Upon closer analysis, however, this appears to be a distinction without a difference because in a Sea Org church the ecclesiastical authority necessarily resides in a Sea Org member.

Furthermore, the Sea Org appears to have considerable financial importance. HCO Policy Letter of 16 June 1969 instructs the Flag Banking Officer International[15] that his duties include "seeing Ships, Bases and Missions adhere to *Sea Org finance policy ...*" (emphasis added). HCO Policy Letter of 20 April 1969 states that due to the "current advent of Sea Org expansion and the recent establishment of an AO–SH [Advanced Organizations–Saint Hill]," the following "firm policy," *inter alia,* is established:

> 3. Proposals relating to tax, leases, purchase or rental of buildings, long term financial commitments, major changes in the Sea Org financial set-up must be approved by the FBO INT and forwarded to the 2nd Deputy Guardian for Finance WW [World Wide] for final okay before such can be activated.
>
> . . . .
>
> 9. In the event of an FBO's failure to do his duty thereby bringing Sea Org

---

**14.** IRS Publication 78, Cumulative List of Organizations described in Section 170(c) of the Internal Revenue Code, is updated and published annually by the IRS. The List as revised to September 30, 1989, lists the Churches of Scientology for Boston, Florida, Hawaii, Michigan, Minnesota, Missouri, Nevada, New York, Portland (Oregon), Sacramento, Texas, Washington State, and Western United States (Los Angeles) as being exempt organizations to which people can make tax deductible contributions. The last named is apparently the successor organization to the Church of Scientology of San Diego, and is not a Class IV church but conducts the activities of The American Saint Hill Church Organization, the Advanced Organization Los Angeles, and the Continental Liaison Office. Appendix to Plaintiff's brief of October 15, 1990, p. 355. It is not clear to the court how these latter entities operate.

**15.** The Flag Banking Officer is a high-ranking official in the financial hierarchy of Scientology organizations.

monies to risk, the FBO INT has the authority to remove him/her from post. . . .

Sea Org members also exercise considerable control over Scientology money through SOR Management Services, Ltd.[16]

## C. *Testamentary Structure of LRH and the Genesis of CST*

LRH died in January 1986. As part of his estate planning, he had made three gifts to the Scientology. The first two were *inter vivos*, and a third was testamentary. All three transfers were made, or in the case of the will, designated, in May 1982.

First, LRH gave use of the Advanced Technology and religious marks to RTC.[17] These Scientology religious marks include the terms "Dianetics," "Scientology" and Mr. Hubbard's name, initials and signature. RTC is charged with the duty to oversee lower-ranking churches to ensure they practice Scientology in an orthodox manner. RTC gave CSI a license to use the marks with any Scientology services sold by CSI on condition that CSI recognize RTC as the final word on matters of theological orthodoxy.[18] As required by Mr. Hubbard's gifts, RTC delegates rights to use the Advanced Technology and religious marks to qualified churches in the ecclesiastical hierarchy and then supervises their activities to ensure compliance with Scriptural requirements. In exchange for use of the marks, churches that minister the Advanced Technology pay RTC six percent of the contributions they receive.

LRH's gift to RTC was conditioned on RTC obtaining exemption under I.R.C.

§ 501(c)(3). Thus far, RTC has been found non-exempt by the Commissioner.

CST was created in 1982 in order to receive the second gift. LRH gave CST two options over the marks and technology which he had given to RTC. The first option is to take control of the trademarks on published LRH works and the insignia of various organizations. The second option is over the Advanced Technology. CST has the option, exercisable at its sole discretion, to take over use and authority of the marks from RTC if RTC allows their use in an unorthodox manner.

The third gift was designated in LRH's will of 1982. In it, CST was made the conditional beneficiary of the remainder interest of LRH's personal estate, after certain bequests to family members. The CST bequest included the copyrights to LRH's Scientology works, and certain limited rights over the marks and technology that he had retained at the time of his gift to RTC.[19] It also included all of LRH's non-Scientology works of fiction which continue to produce royalties. The publishing rights and copyrights alone carry with them the rights to receive the substantial royalties which flow from sales of Scientology books and tapes to the public. These rights will provide CST with a sizable annual income, but only if it achieves tax-exempt status. These assets have not yet been distributed to CST, and they are accumulating income as part of the residual estate, which is being held by a pour-over trust.

## D. *Creation of the Church of Spiritual Technology*

As part of LRH's estate planning, CST was founded in 1982 by Lyman Spurlock,

---

16. *See* discussion *infra* p. 724, n. 23.

17. The Scientology Marks are trademarks which appear on all Scientology materials, and serve as guarantee of orthodoxy. The Advanced Technology is the advanced scriptures, literature and materials of Scientology.

18. Scientology services are required to be orthodox. This means that they must be provided under the "imprimatur of certain marks associated with the religion." PPFF 9 Although orthodoxy is not clearly defined in the record, the court notes it has at least the result of requiring

all churches to buy materials licensed through CSI, the current mother church. *See* discussion *infra* at pp. 724–726. All of LRH's works are copyrighted with formal licensing arrangements made between LRH and the distributing churches.

19. The following copyrighted materials were included in LRH's bequest to CST: a) HCO Policy Letters; b) HCO Bulletins; c) Miscellaneous directives and orders concerning ecclesiastical matters; d) Tapes of lectures on Scientology and the rendering of Scientology services; e) Instructional films on Scientology.

Meade Emory, Esq., Leon Misterek, Esq., and Sherman Lenske, Esq. CST was incorporated as a non-profit corporation under California law, and subsequently sought tax-exempt status under the Internal Revenue Code.

CST's Articles of Incorporation describe the purpose of the organization as follows: "The corporation shall espouse, present, propagate, practice, ensure and maintain the purity and integrity of the religion of Scientology...." Article III, By-laws of Church of Spiritual Technology.

One of CST's specific duties, unique among Scientology churches, is to create and maintain an archive of scriptures for future generations. It is important to Scientology that its scriptures be preserved for at least the next billion years, in order that future generations have available to them the words of LRH.

The other stated purpose behind CST was to provide LRH, then still living, with a depository for the bulk of his testamentary estate, as explained above. CST's founders wanted to accomplish "[t]he creation of an organization to which Mr. Hubbard would be willing to (and did) bequeath the bulk of his estate, and most importantly his copyrights and patents (which include copyrights to scriptures of the religion and patents on the E–Meter)."[20]

CST's operating funds thus far have come exclusively from other Scientology management churches. In 1983, CST received what was described as a "one-time start-up grant" of $17,959,745 from the Church of Scientology Flag Service Organization. In addition, CST has received annual unrestricted grants from RTC ranging from $623,000 to $2.8 million.

None of the founders of CST, with the exception of Mr. Spurlock, has any stated religious connection to Scientology. Messrs. Emory, Misterek and Lenske have served as counsel to other Scientology groups, but nothing in the record indicates that any of them has ever been a member of any Scientology organization. Mr. Lenske and two other non-Scientologists have the status of Special Directors of CST. The Articles of Incorporation require that CST have three such Special Directors, and further requires that they be lawyers in order to ensure that CST takes no action to jeopardize its tax-exempt status.

The General Directors and staff of CST are, however, closely linked to other Scientology organizations. The General Directors (the governing body) must be in good standing with the mother church. Staff members are required to be members of the Sea Org. Trustees of the organization are required to have been Scientologists for at least eight years, and must be highly trained in the teachings and technology of Scientology. CST trustees are also required to remain actively involved in giving and receiving Scientology services. They must also participate in at least twelve and one half hours of training per week.

Many of the staff have held positions of authority in other Scientology organizations. Three of the four trustees of CST worked previously for CSC, which was dismantled in 1981. Terri Gamboa is a trustee of CST. She was also at the same time a Director, the President, and a shareholder of Author Services, Inc. ("ASI"), a Scientology organization. She had formerly been an employee of CSC and of LRH personally. Gregory Wilhere, a trustee of CST, was also formerly an employee of the Founding Church of Scientology, CSC, the Church of Scientology Flag Service Organization and an Australian Scientology organization.

Marion Meisler is a trustee of CST. She was at the same time an employee of ASI, and had previously been employed by CSC, a United Kingdom Scientology organization, and an Australian Scientology organization. Lyman Spurlock is the President of CST, one of its directors, and one of its Trustees. He is also a trustee of RTC. As

---

**20.** Letter from Lyman Spurlock, President of CST to IRS of September 10, 1984, at 5. The E–Meter, as described by LRH, is "[a]n electronic instrument for measuring mental state and change of state in individuals, as an aid to precision and speed in auditing." L. Ron Hubbard, *Understanding the E–Meter* 104 (1982).

trustee, Spurlock has authority to elect and remove the directors who run RTC. Thus, Spurlock has the ability to influence RTC's activities. Spurlock was given a general power of attorney by LRH on March 12, 1984, as his personal employee. Dan Przybylski is Vice President of CST and one of its Directors. He has been an employee of CSC, CSI, and RTC. Leo Johnson is Secretary of CST. Previously he had been an employee of CSC. Nancy O'Meara is the Treasurer of CST. She had been successively employed by various Scientology organizations.

### E. *Activities of the Church of Spiritual Technology*

CST is in the process of creating an archive of Scientology scriptures. These consist of the written and spoken word of LRH, as well as films concerning religious training and the administration of Scientology services. In pursuing this goal, CST has outlined its ambitious program of research into archival methods and technology. The purpose of the archive is to ensure that Scientology scriptures are available for billions of years. CST has thus been motivated to research long-term storage and preservation methods and to try to develop new technologies.

In order to complete its archiving mission, CST has purchased several large parcels of land. The organization's administrative offices and main preservation facility are in San Bernardino, California. The existing buildings at the San Bernardino facility were in serious disrepair when purchased. CST was required to pay large sums of money to repair enough of the buildings to house the resident staff. A number of the buildings remain in need of extensive renovations. The 6,000 square foot preservation building was fitted with multiple layers of sheet rock in the ceiling and floor and also with two-hour fire doors to provide a storage space safe from fire. Another storage facility will be built in San Bernardino to house original Scientology scriptures.

CST has purchased other sites for storage facilities. On these it has built or intends to build vaults with specially constructed doors. Currently, CST owns archive sites in Northern California and New Mexico and has plans to acquire additional sites. The site in New Mexico was purchased for $250,976. The Northern California site cost $1.5 million. Vault construction in New Mexico was begun in 1986 after the construction of staff living quarters, access roads, and water supply. CST also reinforced the face of the site, installed a hoist, and built a work pad, all of which cost $260,000. Other construction costs have included $90,000 to overcome rock fissure impediments encountered in the drilling of the underground tunnels in New Mexico, and $120,000 for maintenance-free doors to be placed at the mouths of the tunnels. Vault construction at San Bernardino and Northern California is predicted to cost over $5 million.

To accomplish its archiving mission, CST employs a staff of from 15 to 63 "highly dedicated" Scientologists who are under the control of CST management. All CST staff members must be trained in Scientology. They live at the preservation site, are paid a subsistence wage, and are required to improve continually their knowledge of Scientology and its teachings. They must spend a specified minimum amount of time each day in Scientology training and teaching pursuits.

CST intends to preserve Scientology scriptures in all of the forms in which they currently exist. Among the technologies that CST is trying to adapt or develop for this purpose are microfilm, color separation for film tape, durable paper and ink for the production of durable masters, digital audio recording, gold and glass laser discs, respooling equipment, soundscriber discs, environmental conditions with respect to creating better storage conditions for archived materials, archival xerography, binding, deacidification of paper used to preserve all written originals, encapsulation in mylar plastics, time capsules filled with inert gas, and construction of vault doors built to be maintenance-free for at least 1,000 years. Because it cannot find equipment and technology that meet its standards, CST has become active in devel-

oping new preservation techniques. CST is also involved in developing new E–Meter technology.

The stages of archiving are elaborate. First, CST must obtain the original Scientology work. Originals have been found in the possession of individuals in many different countries. In most cases, the possessors of the documents have donated them to CST for preservation. CST also obtains originals from RTC. CST makes seven copies of each original: two copies on microfilm, and five on acid-free paper. The microfilm copies reportedly have a lifespan of at least 100 years, while CST expects the paper copies to last 1,000 years. These de-acidified paper copies are known as "durable masters." The original is then encapsulated in mylar and placed in a gas-filled time capsule. Some of the durable masters are placed in fire-proof containers and kept in one of the storage facilities, others are kept available for study purposes.

CST also has begun the process of collecting Scientology films written or directed by LRH. In order to preserve them for a longer period of time, CST plans to process the color out of the film. CST has begun the process of restoring some of the original films. When all of the original films have been obtained, CST intends to make copies to store in each of the planned storage facilities. CST predicts that keeping, storing, copying, and processing the films will be a costly undertaking. Particularly with respect to the color-removal process, CST believes archiving the films will cost $350,000 for the equipment to perform the color-removal process, and $150,000 actually to remove the color from each of the 42 films. To have this work done by an outside professional laboratory would cost over $1,000,000.

CST's archiving activities will include preservation of audio tapes of lectures given by LRH. There are reportedly over 6,500 master reels of original recordings to be copied and preserved. Some of the earlier lectures exist on small "Soundscriber" discs which apparently are a challenging medium to preserve. CST has completed the process of making seven magnetic tape copies of each of the master tapes. This has cost $1.3 million dollars in tape and equipment costs. Of these seven copies, four are archival quality reel to reel tapes destined for storage in the underground storage centers. Two are to be kept for research purposes, and one, of non-archival quality, is to be provided to CSI. CSI will then prepare a transcript of the tapes which it will furnish to CST.

Since magnetic tape cannot be preserved as long as CST would like, it has been investigating other media such as digital sound technology. CST now plans to convert its analog magnetic tape recordings into digital signals which it will then transfer onto special video tape. CST intends to make video tapes of each of the 6,500 master tapes that constitute the library of LRH recorded lectures. This project is expected to cost $200,000. The production of these video tapes will not add to the life of the recorded words, however. Thus, CST eventually plans to transfer the video tapes onto laser discs. Gold-plated glass discs currently seem to have the longest life of all materials, but a full set of such discs would cost more than $6 million, which CST considers excessive.

F. *Financial Structure of Scientology*

CST states that it does not participate in any of the hierarchical church's financial accounts. In a literal sense this may be true. However, given the fact that CST currently gets all its operating funds from other Scientology churches, that courts have found commercialism and financial inurement throughout Scientology, and given the close links to other Scientology organizations forged by the LRH will and by overlapping personnel, the overall finances of Scientology are highly relevant to CST's application.

Procedures for handling money in Scientology are remarkably complex. Income is generated chiefly by the Class IV churches and by the Missions, although income is also generated by the higher level churches. All Scientology services or "auditing" must be paid for, thus the Class IV

churches and missions take in a considerable amount of money from individuals and independent ministers who purchase books, auditing services, and E–Meters from the local church or mission. Payments are made by the lower churches to CSI for ecclesiastical services, and as noted below, all lower level churches are expected to contribute to Central Reserves.

According to CST, each local church keeps several bank accounts, but all money initially is deposited into the "FBO" No. 1 Account. From that account, money can be placed into at least one of nine accounts. These include accounts for money to be paid as attorney fees in the event of litigation, money to be paid to parishioners as a reward for completing a specified course of study, for refunding the fixed donation of a parishioner who is not satisfied with the materials or auditing services, and monies held "in reserve" in accordance with Scientology policy to be used for local purposes. In addition, each church keeps a separate account from which to pay its Field Staff Members' commissions and to cover the local expenses of higher level churches. Finally, each church keeps an account for miscellaneous expenditures that do not fall into any of the previous categories. In addition, some disbursements, such as the required payments to the United States Scientology Films Trust are made directly from FBO No. 1. These are license payments for the films provided to the local churches by the Films Trust.

The court notes that earlier policy letters refer to the requirement adopted in 1965 that all Scientology organizations create "Reserved Payment Accounts." These serve as temporary repositories for monies that may be disbursed to general creditors. Instructions associated with operation of these accounts make it clear that LRH discouraged prompt payment of bills, a policy he referred to as dateline paying. HCO Policy Letters of March 4, 1965 and March 28, 1965. "We aren't interested in bills as bills. We're interested in 'all bills earlier than a certain date.'" HCO Policy Letter

of 28 January, 1965. LRH instructs accounts personnel to take the following approach with tradesmen demanding full payment: "Just say to tradesmen who dun you, 'Oh, really? We'll send you a cheque.' Never say how much." HCO Policy Letter of 28 March, 1965.

Some Scientology corporations are made up of more than one church organization. For example, the Church of Scientology Western United States is made up of the American Saint Hill Organization, the Advanced Organization of Los Angeles, the Continental Liaison Office for the Western United States, and its Estates Org which maintains the physical plant of the Western United States church. Where this is the case, the smaller organizations maintain each of the above accounts independently from the others. There are sometimes transfers between the parallel accounts of the different churches.

Before it can spend any of its money, each of the 141 local churches is required to submit a weekly proposed Financial Planning ("FP") report, which is the proposed budget for the church for that week. The report must be negotiated and approved by two committees composed of church executives (the Advisory Council and the Executive Counsel) both of which have line item veto power. The FP report is further subject to final approval of the local Flag Banking Officer ("FBO").

The FBO is charged with maintaining the financial prosperity and expansion of the church. The FBO prepares the FBO Weekly Report which contains the allocations a church has made to each of its bank accounts, as well as any amount the church will contribute to Central Reserves to benefit Scientology as a whole. The FBO has a high level of ecclesiastical authority with which he or she ensures that all money is allocated and spent properly. The FBO is, in turn, ruled by the local Finance Enforcement Officer ("FEO"), who has higher ecclesiastical rank.[21]

---

21. FBOs and FEOs are themselves subject to the authority of their respective networks. The FBO Network is comprised of staff members of the Continental Liaison Office. The FEO Network is comprised of Continental Finance Ethics Officers, staff members of the Continental

### 1. The Central Reserves

Each local church, mission, and higher level church is required to contribute to the Central Reserves of Scientology.[22] These play an important part in the structure of Scientology finances. Central Reserves are kept in accounts called, variously, central accounts, central bank accounts, SOR accounts or central reserve accounts. The actual money in the account, as distinct from the account itself, is identified as Sea Org reserves, SO reserves, or SOR.[23] The Central Reserves are the responsibility of the individual holding the office of WDC Reserves. The WDC Reserves is a high-ranking member of the Watchdog Committee, and also a member of the Sea Org.[24] The WDC Reserves' immediate juniors are the International Finance Director and the Flag Finance Director. All three of these officers are employed by CSI, and are Sea Org members.

The total amount of central reserves held by Scientology at any given time is difficult to calculate. There are the several Central Reserve accounts maintained by different management-level churches. In addition, there is the account into which the local churches pay their share of the reserves managed by WDC Reserves. In addition, all of the trusts formed by Scientology are considered part of Central Reserves. The Central Reserve account may also carry loans made by it to any of the local churches who may have needed to borrow money following, for example, a drop in auditing sales. Money reported as previously spent out of Central Reserves conservatively totals over $94 million.

### 2. Scientology Trusts

In addition to its many bank accounts, Scientology stores money in at least ten separate trusts. These trusts are considered part of the church's central reserve, and include the International SOR Trust, International Publications Trust, SOR Management Services, the Church of Scientology Religious Trust, the Scientology Endowment Trust, the Church of Scientology Expansion Trust, the Buildings Trust, the Dissemination Trust, the International Missions Trust, and the Films Trust. The trusts own and/or control publication and distribution channels for religious books and products, and provide investment and financial management services. Some of them have been granted tax-exempt status by the IRS as religious trusts. Each of them has a specific place in the financial organization of the church and is supervised directly by its own Board of Trustees. As part of the central reserve system, the trusts are also subject to the ecclesiastical supervision of CSI. CSI ensures that trust monies are spent in accordance with orthodox Scientology policy.

### 3. Bridge Publications

Bridge Publications, Inc. ("BPI") is:

> ... a California for profit corporation. BPI publishes and distributes the Scientology Scriptures (including books and recorded tapes), manufactures, repairs and distributes E–Meters, and publishes and distributes fiction works written by L. Ron Hubbard.

Sea Org members hold all of the upper level management positions in BPI, and many of its employees are Sea Org members. BPI is organized and operates (to the extent consistent with its status as a for profit business corporation) in accordance with the Scriptures.

Prior to the incorporation of BPI in 1981, the publication and distribution of the Scriptures and the manufacture and distribution of E–Meters in the United States were activities of Church of Scien-

Liaison Offices. These officers are in turn supervised by the Flag Finance Ethics Officer, who is an employee of CSI.

**22.** CST apparently maintains its own Central Reserve account.

**23.** This money is managed by Sea Org members through SOR Management Services, Ltd., a for-

profit corporation in the United Kingdom, which acts as an agent for U.S. churches and trusts which hold Central Reserve Accounts: CSI, CSFSO, CSC and the Churches of Scientology of New York, Boston, Las Vegas, and Portland.

**24.** See discussion *supra* at 717–19.

tology of California. Upon incorporation of BPI, Church of Scientology of California (CSC) transferred the assets used in those activities to BPI in exchange for all of its capital stock. In 1982, CSC sold all of the shares of BPI to International SOR Trust, a non-U.S. religious trust. In 1985, International SOR Trust transferred the shares of BPI to International Publications Trust (IPT), which continues to own all of the shares.

IPT is a Scientology religious trust governed by three trustees. .... Two of the trustees of IPT are non-resident aliens. The third is a United States citizen and resident and a staff member of CSI, holding the position of WDC Pubs, i.e., the member of the Watchdog Committee concerned with ecclesiastical matters relating to the publication, manufacture, distribution and sale of the Scriptures and of the E-meters.

In addition to the shares of BPI, IPT owns all of the capital shares of a for profit holding company (a United Kingdom corporation) which in turn owns all of the capital shares of New Era Publications (NEP), the Danish for-profit publisher which publishes and distributes the Scriptures outside the United States. NEP is managed and primarily staffed by Sea Org members.

BPI has the right to publish the Scriptures and to manufacture E–Meters pursuant to agreements with NEP. NEP in turn has the right to produce these items and to license their production pursuant to agreements entered into with L. Ron Hubbard. Under these agreements, BPI pays royalties to NEP with respect to the copyrighted and patented articles, and NEP in turn pays royalties to Mr. Hubbard and his successors in interest, with respect to royalties received from BPI and with respect to items published directly by NEP.

P App. pp. 376–77. Thus BPI is ultimately controlled by three trustees, one of whom is a CSI staffer, the WDC Pubs. The WDC, a function of CSI, in turn is more generally responsible for "oversee[ing] the entire international ecclesiastical management structure of the Church," including publication activities of BPI and NEP. P App. pp. 336–38, 375–80. BPI and NEP hold the requisite licenses to sell Scientology materials, and any payment made to BPI or NEP eventually devolves to the financial benefit of "Mr. Hubbard and his successors," which includes RTC and CST. Furthermore, all religious materials must be orthodox, and only materials licensed by CSI are orthodox. Although it is apparently the pour-over trust that currently receives royalties from the publication rights, it is CST that, under the will, stands to move into the position of ownership of those rights.

Thus, CST not only is positioned to support BPI's for-profit activities by furnishing authentic copies of archived materials,[25] it stands to receive royalties from the for-profit publishing companies, and, if it exercises its options over RTC, will receive royalties from use of the advanced technology. As to the supplying of Scientology services, in view of CSI's receipt from RTC of the license to use the trademarks, it would appear to have stepped into Mr. Hubbard's shoes to the extent of receiving payments for use of the marks. Presumably if CST exercises its option over RTC, it would be

---

25. CST has two roles with respect to films and tapes as well. Under LRH's will, CST stands to take ownership of those assets. It is also responsible for archiving such materials. Nevertheless, until CST's rights are clarified, BPI and CSI will be involved with the receipt of proceeds from the production and distribution of films and tapes. LRH licensed his copyrights in the films to CSC in 1982 for distribution in the United States. Outside–the–United States distribution was to be done by an entity designated by LRH. Golden Era Studios was set up by CSC to reproduce audio tapes and to produce motion pictures. CST represented to the Commissioner that "in 1985, CSC sold the assets of Gold to CSI, and since then all activities of Gold have been conducted by CSI." The United States Scientology Films Trust was created to distribute the films to churches in the United States, "to receive license fees from them, to pay over to CSC its costs of production and thereafter to retain and expend the amounts received from the churches for religious purposes." After having paid for the films, the trust has collected "in excess of $3 million." As to tapes, BPI "is licensed to copy the tapes," presumably under a prior arrangement with LRH.

able to control those marks as well, thereby completing its ownership of the publishing rights, the advanced technology, and the marks.

### 4. The Doctrine of Exchange

During the administrative process, the IRS questioned CST regarding the doctrine of exchange. The doctrine of exchange requires that in order to receive, it is also necessary to give. A Scientologist is obligated to exchange something he values for anything he acquires. Thus, he must exchange cash for auditing services. He must exchange cash for Scientology books. He must exchange any original LRH documents he possesses for the satisfaction of advancing the Scientology cause. The doctrine was described as a fundamental belief of the religion, yet at other times, CST insists it is a minor part of Scientology. It has, however, consistently been cited as the explanation for why all Scientology religious services must be paid for by those receiving them. CST explains the doctrine as being based on early writings of LRH which discuss the importance of balancing inflow of money or services, for example, with outflow.

### G. *Prior Litigation Involving Scientology*

The instant litigation is not the first time a Scientology organization has been in court. At the administrative level, the Government relied in part on findings made by other courts in earlier litigation involving Scientology churches. CST opposed making such use of prior litigation, arguing that it occurred largely before CST even existed.

To the extent findings or conclusions in other cases are inconsistent with the record

developed exclusively for CST, the record here controls. The court will, nevertheless, consider non-conflicting evidence introduced into the record from other litigation, and will take judicial notice of reported opinions dealing with Scientology organizations.[26] The court finds below that CST is inextricably linked to Scientology as a whole. It would have been naive for the Commissioner, and it would be equally naive for the court, to ignore the implications of the genesis of CST and its links to other Scientology organizations.

Courts that have examined the affairs of the other Scientology management churches have been persuaded that the way in which Scientology operates is often indistinguishable from any commercial activity, and that church resources have been used for private benefit. In *Church of Scientology of California v. Commissioner,* 83 T.C. 381 (1984) (*"CSC"*), the court held that the Church of Scientology of California was no longer being operated in accordance with I.R.C. § 501(c)(3) and therefore the IRS was entitled to revoke its tax-exempt status. The court in *CSC* found substantial evidence of private inurement to LRH and his family, including salaries, management fees, complete support of LRH's family, and royalty payments on LRH's writings. *CSC,* 83 T.C. at 492. Additionally, the *CSC* court found "covert indicia of benefit" to LRH including repayment of unspecified debts, and LRH's absolute control over the millions of dollars resting in Operation Transport Corporation, Ltd.[27] and the United States Churches of Scientology Trust. *Id.*

The court in *CSC* also found that the church had failed to carry its burden of proving that it was organized and operated

---

**26.** See *United States v. Estep,* 760 F.2d 1060, 1063 (10th Cir.1985); *see also E.I. Du Pont De Nemours & Co. v. Cullen,* 791 F.2d 5, 7 (1st Cir.1986) (court took notice of complaint filed in state court proceeding which dealt specifically with matters at issue in federal proceeding and where neither party disputed document's authenticity.); *St. Louis Baptist Temple, Inc. v. FDIC,* 605 F.2d 1169, 1172 (10th Cir.1979) (federal court may take notice of proceedings in other courts which have a direct relationship to mat-

ters at issue). *See generally,* IX Wigmore on Evidence §§ 2578–2579 (Chadbourn rev.1981).

**27.** Operation Transport Corporation, Ltd. ("OTC"), is a non-charitable Panamanian corporation, found by the court in *CSC* to be run by the Flag Banking Organization ("FBO"). *CSC,* 83 T.C. at 387. OTC was found to be a sham corporation for which FBO created financial records to give the false impression of a legitimate, independent existence. *Id.* at 505.

exclusively for exempt purposes, and had failed to produce financial information, or had denied the IRS access to many financial records. The documents it did provide were turned over in a confused, disorderly fashion with no index and no assistance or explanation of what was contained in them. This lack of cooperation, on which the court remarked throughout the opinion, led it to hold that it could draw negative inferences from the evidence not produced. "The failure of a party to produce relevant evidence within its possession or control gives rise to the presumption that, if produced, it would be unfavorable." *CSC*, 83 T.C. at 502 (citations omitted). Based on the lack of information provided, the court found the United States Churches of Scientology Trust and the Operation Transport Corporation were run for the private benefit of LRH and his family. *CSC*, 83 T.C. at 500. The *CSC* court further found that the church of Scientology was operated for the substantial commercial purposes of tax evasion, making money, and criminally manipulating the IRS as a method of financial planning. *Id.* at 504.

In litigation, Scientologists continually have accused the IRS of singling them out for a unique kind of religious persecution. In *CSC*, the court examined the history of IRS actions against various Scientology churches and found that Scientology organizations have indeed been frequently investigated by the IRS. Many of the investigations were lengthy and far-reaching. The IRS expounded special instructions in a "Manual Supplement" issued to its investigators and attorneys specifically regarding the treatment of Scientology churches. Upon specific examination of the IRS's behavior in *CSC*, the court found no support for the Scientologists' claims of harassment. It found instead that the IRS had in fact been deliberate in its investigation of CSC, and had followed the same procedures used in investigations of other churches. The court also found that the Scientology churches' own behavior had more than justified the IRS's attention. *CSC*, 83 T.C. at 453.

Litigation involving Scientology organizations has often been protracted and combative. For example, even though the IRS revoked CSC's tax-exempt status in 1967, CSC continued to file informational Form 990's, and no other forms, even though it had been told to begin filing annual returns.[28] *CSC*, 83 T.C. at 382, 405. CSC ignored the IRS revocation, which it claimed it was entitled to do, since its tax-exempt status had been improperly revoked and was thus ineffective.[29]

In *Founding Church of Scientology v. United States*, 188 Ct.Cl. 490, 412 F.2d 1197 (1969), *cert. denied*, 397 U.S. 1009, 90 S.Ct. 1237, 25 L.Ed.2d 422 (1970), members of the Founding Church of Scientology filed a refund suit. Plaintiffs claimed that they were a religious organization under I.R.C. § 501(c)(3), and therefore were entitled to have money previously paid in taxes refunded to them. The Court of Claims denied the claim. The court found that some of Founding Church's money inured to the individual benefit of LRH, his wife and son. This included a house maintained by the church, a percentage of the church's income, and other royalties and commissions. The court based its finding of inurement on informal loans made to LRH that were never sufficiently explained or documented.

In *Founding Church of Scientology, Inc. v. Webster*, 802 F.2d 1448 (D.D.C. 1986), *cert. denied*, 484 U.S. 871, 108 S.Ct. 199, 98 L.Ed.2d 150 (1987), the plaintiff initiated a suit against William Webster, Director of the FBI. Founding Church members alleged that the FBI was harassing Scientologists for no permissible reason. The district court dismissed the litiga-

---

**28.** Form 990 is a form filed by non-profit organizations.

**29.** The proper procedure, of which CSC had been notified by the IRS, would have been for CSC to have filed the forms appropriate for an organization no longer exempt, pay the tax then assessed, and then apply for a refund. I.R.C. § 6011(a); *CSC*, 83 T.C. at 404. The right of CSC to pursue an administrative review of the revocation does not change the fact that revocation letters are effective upon their issuance. Treas.Reg. § 601.201(n)(6).

tion after the Founding Church of Scientology defied a court order to produce LRH for deposition. The case came to a standstill at the church's continued refusal to cooperate with a request to produce LRH for a deposition. The church took the position that LRH was no longer a "managing agent" of the church and therefore was not a party to the litigation. The FBI had submitted prima facie evidence that LRH was still a managing agent of the Founding Church and should appear for deposition. The Founding Church merely repeated its assertion that LRH was not a managing agent, and that in fact he had severed nearly all contact with the church management. The district court ordered the Founding Church to produce LRH for the limited purpose of countering the FBI's prima facie evidence. The court found that despite LRH's formal resignation from all management positions in Scientology, in fact he maintained control of Scientology's finances and policies through his position in the Sea Org and other covert means. "Ultimate control, we have no doubt, he possessed until his death." *Webster*, 802 F.2d at 1456. After eight years of pre-trial discovery, the district court dismissed the case.

In affirming, the circuit court noted that the Founding Church filed its complaint in the same year (1978) in which Mary Sue Hubbard and eight other high-ranking officials of the church admitted in a plea agreement that "the network of Scientology organizations had conducted a broad campaign against U.S. Government entities particularly the Internal Revenue Service." *Webster*, 802 F.2d at 1450. In fact, the *Webster* court noted that the same government investigations the Founding Church complained about were justified by, and a result of, the church's own illegal behavior. *Webster*, 802 F.2d at 1450 n. 3.

In *United States v. Zolin*, 905 F.2d 1344 (9th Cir.1990), *cert. denied, Church of Scientology v. United States*, — U.S. —, 111 S.Ct. 1309, 113 L.Ed.2d 244 (1991), the Ninth Circuit found that the tapes of the MCCS conference, held in 1981, reveal that "[t]he figures involved in MCCS admit on the tapes that they are attempting to confuse and defraud the government." *Zolin*, 905 F.2d at 1345. The tapes were therefore not protected by the attorney-client privilege because they fell within the crime-fraud exception to the privilege.

## H. *Proceedings Before the Commissioner*

The administrative process in this case began in 1983, when CST filed its initial petition for tax-exempt status. The process occupied nearly five years, ending on July 8, 1988, when the IRS issued its final adverse ruling. In the process, the parties put together one of the largest tax records ever accumulated. The Government complains, however, that on numerous occasions critical inquiries went unanswered, and that, despite its heft, the record is light on explanations. The court's examination of the record supports the Government's critique. Although CST frequently inundated the IRS with material, numerous key points were not candidly addressed. CST responded to some of the IRS's questions, but it refused to respond to others, claiming it did not understand the question, or chose merely to refer to previous responses.

CST, CSI, and RTC all applied for tax-exempt status at the same time. The IRS requested information about the circumstances surrounding the founding of these three organizations. The IRS specifically asked who initiated and oversaw the reorganization of the Scientology hierarchy. The IRS also enumerated the connections it saw among the three applicants and the existing Scientology hierarchy and asked for comment. The IRS did not say it would never consider CST's application separately, only that until the apparent connections were explained, it could not. CST continually refused to answer these questions, demanding that the IRS treat CST's application independently of RTC and CSI. At one point, CST informed the IRS that "it did not agree" that the IRS could not rule on CST's application without information about other Scientology organizations. In that same letter, rather than provide infor-

mation to explain why the IRS's reservations about CST's tax-exempt status were groundless, CST simply stated that it rejected assertions made by the IRS, and that the reservations were insignificant anyway.

When pressed for additional information on its relationship to other Scientology organizations, CST merely repeated its initial inadequate answer that it did not voluntarily recognize the hierarchical church. The IRS found that answer inadequate, and asked the question again. CST gave a similar answer: "This assertion implies that [CST] is a part of the Scientology hierarchy. It is not. See our letter to you dated 10 September 1984." [30]

Rather than offer an explanation of the option agreements it held under LRH's gift, CST stated instead, "We do not consider [the options] to be as you characterize them. However, the agreements speak for themselves." [31] On another occasion, CST refused to respond to allegations in affidavits from former church members that the MCCS conference was tasked with devising a new structure which would mask LRH's actual control of Scientology and make it appear that he no longer took an active role in running the church. CST replied that the IRS "had no business" relying on information from such people.

On April 22, the IRS again wrote to CST for additional information. CST's response contained nothing new. For example, the IRS inquired about Sherman Lenske, Stephen Lenske and Lawrence Heller and their role as CST's "special directors." Instead of providing a meaningful answer to the question, CST replied, "We commented upon your position in our earlier correspondence ... [w]e request that you inform us of the relevance of their other associations to the exempt status of this organization." [32]

The final stage of the administrative process began in March 1988. The IRS sent agents to CST's headquarters to conduct an on-site review of the organization's financial activities and operations. CST had agreed to allow the investigation. The process came to an end in June 1988 when, according to the IRS, CST refused to cooperate with the agents' requests for records. CST denies that it refused to cooperate, but agrees that it sent a letter in protest to the IRS on June 24, 1988, because an IRS agent had interviewed Vicki Aznaran, formerly the Inspector General of RTC,[33] without first informing anyone from CST. Although CST vehemently protests that it did not refuse to cooperate further with the onsite review, the June 24, 1988 letter states, "With that, we informed Mr. Joseph that Applicants were suspending the review until we resolved the matter with the National [IRS] Office." [34]

Following the issue of a Final Adverse Ruling letter on July 8, 1988, counsel for CST sent several letters to the IRS attempting to continue the administrative process and challenging the IRS's position that it had been uncooperative. The IRS did not re-open the record, and the Final Adverse Ruling remained as issued. CST brought the instant action to challenge that ruling.

## II. DISCUSSION

Income tax exemptions must be strictly construed, with any doubts to be resolved in favor of the taxing entity. *Harding Hospital, Inc. v. United States*, 505 F.2d 1068, 1071 (6th Cir.1974). Consequently, determinations of the Commissioner are presumed correct. *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933). To the extent that the Govern-

---

**30.** Letter from CST to IRS of November 7, 1984.

**31.** Letter from CST to IRS of September 10, 1984.

**32.** Letter from CST to IRS of June 26, 1985.

**33.** The post of Inspector General of RTC is described by CST as "the highest ecclesiastical position within RTC." [P App. p. 361]

**34.** Despite CST's objections, the IRS agents were well within the law in contacting Ms. Aznaran. The IRS is authorized to contact any person and take testimony from that person "as may be relevant or material." I.R.C. § 7602(a).

ment relies on the grounds stated in the Commissioner's final decision, plaintiff thus bears the burden of proving its entitlement to an exemption. *Bubbling Well Church of Universal Love, Inc. v. Commissioner,* 670 F.2d 104, 106 (9th Cir.1981); *Freedom Church of Revelation v. United States,* 588 F.Supp. 693, 696 (D.D.C.1984). The court's review is based on the record below. *Church of Spiritual Technology v. United States,* 18 Cl.Ct. 247, 249 (1989). We accept as true statements in the record made by CST that were not challenged by the IRS. This does not obligate the court otherwise to accept conclusory statements contradicted elsewhere in the record.[35]

In order to qualify as a tax-exempt organization under I.R.C. § 501(c)(3), CST must prove that it is both organized and operated exclusively for tax-exempt purposes. Treas.Reg. § 1.501(c)(3)–1(d)(1)(i)(a). To meet the organizational test, CST must show that its Articles of Incorporation do not authorize it to undertake any non-exempt activity. Treas.Reg. § 501(c)(3)–1(b)(i)(iii). Further, in the event of dissolution, all of its assets must be directed to exempt organizations. *Id.* § 501(c)(3)–1(b)(4). This is chiefly a matter of careful drafting, and the court finds that CST has met this test.

■ To meet the operational test, CST must show that it operates exclusively for exempt purposes, that it has no substantial non-exempt purpose, and that no benefits inure from it to private individuals. *See* Treas.Reg. § 1.501(c)(3)–1(c). The mere fact that an organization has *a* tax-exempt purpose or activity does not mean that it does not also have a purpose or activity that is non-exempt. One substantial non-

exempt purpose will make an organization ineligible for tax-exempt status, even if all of its other purposes are exempt. *Better Business Bureau v. United States,* 326 U.S. 279, 283, 66 S.Ct. 112, 114, 90 L.Ed. 67 (1945); *Freedom Church of Revelation,* 588 F.Supp. at 696. If CST devotes "more than an insubstantial part of its activities" in support of a non-exempt purpose it would still fail the operational test. Treas. Reg. § 1.501(c)(3)–1(c)(1).

## A. *CST's Application Must Be Viewed in Light of Other Scientology Activities and Organizations*

■ CST has attempted to disassociate itself from any negative inferences to be drawn from other aspects of Scientology. For that reason, CST maintains that its status as an exempt organization must stand or fall upon its own documents and activities, not those of other Scientology organizations. *Parshall Christian Order v. Commissioner,* 45 T.C.M. (CCH) 488, 491, 1983 WL 14005 (1983). As a general proposition, this is correct. Where there is in fact no meaningful separation between the entities in question, however, the connections between the organizations can at a minimum be considered to see if they bear on the merits of the application for exemption. In this case, there are a number of reasons that CST's tax-exempt status cannot be considered independently of other Scientology organizations. One is shown in the web of personnel links between CST and other Scientology groups, discussed above at pages 719–20, but there are at least three other connections.

CST is not a church,[36] therefore it must

---

**35.** *World Family Corp. v. Commissioner,* 81 T.C. 958, 965 (1983).

**36.** CST represents that it is a religious corporation organized to accomplish the activities of a church. Despite its name, CST is not itself a church as defined in the tax laws. It is not "a coherent group of individuals and families that join together to accomplish the religious purposes of mutually held beliefs," which the Tax Court has identified as a defining characteristic of a church. *Church of Eternal Life v. Commissioner,* 86 T.C. 916, 924 (1986). Nor does it have a sufficient amount of the characteristics of a

church specified by this court in *Church of the Visible Intelligence that Governs the Universe v. United States,* 4 Cl.Ct. 55, 64 (1983). The only characteristic of a church that CST does have is independent legal existence. That alone does not suffice for CST to qualify as a church under the tax code. As an archiving body, CST does not assemble parishioners regularly to worship. *See American Guidance Found., Inc. v. United States,* 490 F.Supp. 304, 306 (D.D.C.1980). It provides Scientology services to its staff members, but this is incidental to its chief stated function of making an archive. The incidental provision of religious services is not sufficient

try to qualify as a religious organization.[37] *Compare* Treas.Reg. § 1.501(c)(3)–1(d) *with* Treas.Reg. § 1.511–2. Congress intended that the term "religious organization" have a less restrictive meaning in the tax code than the term "church." *Foundation of Understanding v. Commissioner,* 88 T.C. 1341, 1356 (1987). But the only religious aspect of CST is its connection to Scientology. CST has no exempt purpose absent the religious patina it draws from Scientology. Simply archiving a man's words is not inherently an exempt purpose. *See, e.g., Senior Citizens Stores, Inc. v. United States,* 602 F.2d 711 (5th Cir.1979); *Miedaner v. Commissioner,* 81 T.C. 272 (1983); *Western Catholic Church v. Commissioner,* 73 T.C. 196 (1979), *aff'd,* 631 F.2d 736 (7th Cir.1980). CST therefore derives its religious character, not from its activities *per se,* but from Scientology. CST recognizes this in its Articles of Incorporation: "[T]he corporation is formed ... [t]o serve as a means of promulgating ... the religious faith of Scientology around the World...." If the documents CST is preserving are religious, it is because they are the scriptures of the Scientology religion. If CST has a religious purpose it is to further the interests of Scientology by creating a durable record of its founder's teachings. This inextricably links CST to other Scientology organizations.

CST is also linked to Scientology through its authority to control the religion's income-producing property. CST has the power to dismantle RTC by taking over the religious trademarks and use of the Advanced Technology, thereby gaining direct control over all Scientology organizations that purchase trademarked material.[38]

CST claims that it does not and will not monitor RTC's use of the religious marks and technology. CST explains that there is no need to do so because any unorthodox use would be immediately obvious. Regardless of how it arrived at the conclusion, however, the point is that one of its obligations is to prevent misuse of the marks and technology. CST's present confidence in RTC has no significance. If CST ignored that element of its charter, one of the assumptions built into LRH's gift would be missing. Monitoring for a misuse by RTC is a form of ongoing oversight. The decision to exercise the option is an ecclesiastical one which would not be readily susceptible to judicial review. Upon exercise of the option, CST would inherit RTC's role as the final voice on Scientology orthodoxy. This would give CST ecclesiastical authority over even CSI, since "CSI itself is ecclesiastically subordinate to RTC." PPFF 17. The conclusion which the court must necessarily draw from LRH's property distribution scheme is that CST has the absolute authority to take control of the bulk of the income-producing property of Scientology.

Indeed, the need for CST to take even the intermediate step of exercising its options may have been obviated. The Commissioner found RTC to be non-exempt. The gift to RTC was conditioned on its obtaining tax-exempt status. If the gift fails, as it appears to have, there is nothing over which to exercise an option. Assuming CST secures tax-exempt status, it would appear destined, as beneficiary of LRH's residual estate, to collect the balance of the income-producing property.[39]

to qualify an organization as a church. *Foundation of Human Understanding v. Commissioner,* 88 T.C. 1341, 1357 (1987) (citing *De La Salle Inst. v. United States,* 195 F.Supp. 891, 901 (N.D.Cal.1961)).

**37.** The distinction matters because churches receive more favorable treatment under the Internal Revenue Code than do religious organizations. For example, churches may be investigated by the IRS only in accordance with strict and specific procedures specified in I.R.C. § 7611.

**38.** This really means all organizations, because only trademarked materials are considered orthodox in the religion.

**39.** CST represented to the Commissioner in 1985 that it understood its rights to include the following: "[I]n the event it is determined that Religious Technology Center is not exempt, this corporation *will* exercise it options and acquire the marks and materials...." (Emphasis supplied.) In its 1987 Supplemental Submission, CST attempted to back away from this interpretation, but still conceded

if [the IRS] recognizes CST's exemption, CST would have the power to acquire RTC's rights

The religious trademarks and rights to the Advanced Technology constitute most of the income-producing property owned by any of the Scientology organizations. The remainder of LRH's income-producing property is already designated for CST. Upon its qualification for tax-exempt status, CST could, therefore, obtain, by operation of LRH's will, all of the rights LRH reserved when he made his gift to RTC, as well as the copyrights to Scientology scriptures, which presumably constitute the very heart of Scientology. The copyrights to LRH's science fiction works will also devolve to CST under the will. This intellectual property alone was valued at $25,000,000 by the trustee appointed by the court to administer LRH's estate.

In these circumstances, it is at best disingenuous for CST to maintain that it is "independent" of Scientology's ecclesiastical hierarchy. LRH certainly succeeded in creating an entity that is not nominally subject to the ecclesiastical control of other Scientology organizations. Rather, the potential control runs in the opposite direction. CST stands poised to assume a position at the apex of a pyramid of both ecclesiastical authority and financial control over Scientology.

Finally, the converse of CST's control in the area of orthodoxy is that until it obtains tax-exempt status, CST will be as it has been, entirely dependent on payments from other Scientology organizations. Indeed, CST's Articles of Incorporation specifically state that it does not solicit any funds itself, nor does it have any plans to do so.[40] CST states that it alone controls its financial matters. Possibly this is true with respect how money is spent once held by CST. It has not been true, however,

with respect to obtaining the money that CST spends. All of this has come from other Scientology organizations, and could, presumably, be cut off.

In sum, there is a strong link, in fact an identity of purpose, between CST and other Scientology organizations. CST was created to serve LRH as a personal estate-planning device and to support the work of Scientology. CST would not exist without the rest of Scientology. Its activities and purpose must, therefore, be considered in light of its connection to Scientology as a whole. Although CST has repeatedly declared that it does not "voluntarily" recognize the authority of the Scientology hierarchy and thus is ecclesiastically independent of it, the statement is virtually meaningless in the context of this litigation. CST, therefore, has the burden of dispelling concerns raised by its association with other non-exempt entities.

### B. Substantial Non–Exempt Purpose of Scientology

#### 1. Activity Cannot be Confused with Purpose

■ CST has assiduously developed a record which demonstrates that most, if not all, of its prior activities are directed at preserving scripture. CST does not sell or market archived material, or make any profit on its activities. But even if CST could show that 95 per cent of its employees did nothing but archive Scientology documents, and only the remaining five percent were in charge of CST's property interests and finances, that alone would not be enough to secure tax-exempt status. Congress did not intend for mere quantity of dedicated resources to be the deciding

in the marks and Advanced Technology if RTC's exemption were denied. When its exemption is recognized, CST will receive Mr. Hubbard's estate and become owner of the limited powers of appointment over the marks and the Advanced Technology that Mr. Hubbard retained. As owner of these interests, CST will have the legal right to designate the section 501(c)(3) transferee of RTC's rights in the marks and the Advanced Technology. In the event RTC cannot obtain exemption. *As a section 501(c)(3) organization,* *CST itself would qualify to receive these rights.* (Emphasis supplied.)

**40.** The fact that CST does not raise its own funds is itself unusual for a would-be I.R.C. § 501(c)(3) organization, and limits its ability to be independent. In *B.S.W. v. Commissioner,* 70 T.C. 352, 359 (1978) the court denied a tax-exemption and stated, "its financing does not resemble that of the typical I.R.C. § 501(c)(3) organization. Petitioner has not solicited, nor has it received, voluntary contributions from the public."

factor in whether an organization is operated for exclusively exempt purposes. Section 501(c)(3) contemplates that the IRS (and the court, if necessary) will inquire into the reality of an organization. "The bare fact that approximately half of each group is composed of not-for-profit organizations does not compel the conclusion that there is absent a substantial nonexempt purpose." *Copyright Clearance Ctr. v. Commissioner*, 79 T.C. 793, 809 (1982); *See also Better Business Bureau*, 326 U.S. at 283, 66 S.Ct. at 114.

CST confuses activity with purpose. The law does not. As the Tax Court has held, "The operational test focuses on the purpose and not on the nature of the activity." *Goldsboro Art League v. Commissioner*, 75 T.C. 337, 343 (1980). The Commissioner, and the court, are permitted to consider not just an organization's activities, but also to inquire into its purposes. The fact that an organization's activities have religious overtones and do not produce profits is no assurance those activities will be tax-exempt. "[T]he critical inquiry is whether petitioner's primary purpose for engaging in its sole activity is an exempt purpose, or whether its primary purpose is the non-exempt one of operating a commercial business producing net profits for petitioner." *B.S.W. Group, Inc. v. Commissioner*, 70 T.C. 352, 359 (1978); *accord Christian Manner Int'l, Inc. v. Commissioner*, 71 T.C. 661, 668 (1979).

In evaluating the real purpose of a transaction, the Supreme Court has cautioned against uncritical reliance on form as against function. *Gregory v. Helvering*, 293 U.S. 465, 470, 55 S.Ct. 266, 268, 79 L.Ed. 596 (1935), involved a scheme to avoid taxation of corporate distributions by invoking a code provision applicable to reorganizations:

> The whole undertaking, though conducted according to the terms of subdivision (B), was in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else. The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation, because the transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose.

In like fashion here, CST must demonstrate that it was organized for an independent and bona fide purpose. Given the prior history of Scientology and the peculiar circumstances of CST's birth, it is appropriate to look beyond the flurry of archiving activity and inquire into whether the very existence of CST was brought about primarily to serve the non-exempt ends of other Scientology organizations. Although CST is entitled to minimize its own taxes, it would be a misuse of I.R.C. § 501(c)(3) if its primary *raison d'etre* was to shield the income of other organizations from tax.

### 2. Scientology's Preoccupation with Finances

The court has attempted above to describe Scientology's Byzantine management structure and financial arrangements. The task is difficult, due to the proliferation of entities and accounts and the overlap of personnel. Scriptural emphasis on taking in money as well as passive resistance to tax inquiries has been described above.[41] Other courts have encountered

---

**41.** Examples of LRH's interest in maximizing income and minimizing taxes, such as the following, are legion:

> Make lots of money. Spend it frugally. So it gives a tax problem. So what? Your accountants should be capable of avoiding tax problems. Whether you do or don't have money, you will always have a tax problem because governments are crazy. The way to solve tax problems is to have money, not to be broke.

> Taxes exist only to destroy businesses. Be impudent. Get rich and to hell with them. Governments are just a reactive bank we have to live with for a while. Learn to handle them. But not by refusing to make money or have it.

HCO Policy Letter of 28 January, 1965.

> Now as to TAX why this is mainly anybody's game of what is a PROFIT. The thing to do is to assign a significance to the figures before the government can. The whole thing

this same phenomenon. The commercial character of the scriptures is manifest:

> Scientology income is high in most orgs. But it IS high due to the investment of time and money in earlier years. So if the balance sheets omit all the money that was invested and show only the money that was made, they are false balance sheets. And that is what the government wants us to turn in—a false balance sheet that shows all income as profit with no repayment or retirement of debt.

HCO Policy Letter of 25 June, 1967.

The Doctrine of Exchange discussed previously is another indication of Scientology's preoccupation with money. While the parishioner may believe the exchange to be spiritually beneficial, it still has the hallmarks of a commercial exchange. The Supreme Court also came to this conclusion in *Hernandez*, 490 U.S. at 684, 109 S.Ct. at 2141, where the Court held that individuals who make auditing payments to Scientology are not entitled to take a tax deduction for them.

Moreover, the doctrine is abandoned in circumstances where LRH deemed it expedient for "rapid dissemination" of Scientology doctrine. In HCO Policy Letter of 1 January AD13, Central Orgs are instructed to process selected celebrities "who are just beyond or just approaching their prime." The scripture goes on to say, "The pay is to be 'Any contribution you would care to make if we have helped.' No other pay is demanded." This desertion of the presumably fundamental Doctrine of Exchange appears to be theologically unprincipled, but it is not unlike a commercial business strategically giving away services in an effort to increase sales by obtaining a celebrity endorsement.

A great deal of money is realized from the sale of auditing services and LRH's books. CSI fixes the retail price of LRH's books, in conjunction with the for-profit publisher, Bridge Publications, Inc. The prices are set with an eye to maximizing dissemination of the works as well as to maintaining a profit margin for the church bookstores. A minimum inventory is mandated by church policy. Further, Scientologists who work in the bookstores are entitled to earn commissions on the books they sell. There is little, if any, difference between such an arrangement and that maintained by any commercial bookstore. Indeed in the HCO Policy Letter of 14 May, 1959, LRH describes an even less charitable pricing policy for books: "Establish fully the printing cost. Multiply by five. This is the cost of the book to usual buyers. However, a book price can be further increased so that when one gets a 20% discount reduction he pays a whole figure."

The administrative record contains no figures as to the amount of money realized through the sale of LRH books. A court appointed appraiser, however, in valuing LRH's estate for purposes of probate, valued the entire estate at $26,305,706, of which $25,000,000 was the value of LRH's intellectual property, i.e., the copyrights and trademarks of his Scientology publications. That figure, even discounting the value of the E-meter patents and other non-publication elements, does nothing to dispel the appearance of commercial profitability. *See Goldsboro Art League*, 75 T.C. at 344; *B.S.W. Group*, 70 T.C. at 357.

The complexity of Scientology's financial procedures, its dizzying array of reticules, and the potential for virtually constant transfers of funds, inevitably raise questions about the propriety of a tax exemption for CST, due to its links to that system, which will be permanently forged upon a declaration of CST's exempt status. In that event, the assets of the pour-over trust devolve on CST—namely the right to the books, tapes, films and E-meters, along with the accumulated income therefrom. These, in turn, are licensed in part to for-profit entities for distribution. This arrangement simply does not resonate with the image of a tax exempt organization.

---

is a mess only because arithmetic figures are symbols open to ANY significance. So I normally think of a better significance than the government can. I always put enough errors on a return to satisfy their bloodsucking appetite and STILL come out zero.
HCO Policy Letter of 25 June, 1967.

Instead, it calls to mind Werner Heisenberg's uncertainty principle.[42] In Scientology's case, the opacity is so pronounced as to approach wilfulness. Organizations adjudged exempt simply do not exhibit the financial complexity or the phenomenal preoccupation with money displayed by Scientology's management churches and organizers. *See, e.g., Universal Life Church, Inc. v. United States,* 372 F.Supp. 770 (E.D.Cal.1974) (finding that organization that offered religious course of study and accepted, but did not require, payment for its materials was tax-exempt); *National Found., Inc. v. United States,* 13 Cl.Ct. 486 (1987) (holding that foundation that supported other exempt organizations with money it collected from public was exempt because it gave away bulk of money taken in); *Goldsboro Art League,* 75 T.C. at 345 (finding that art league's sale of a few paintings of various local artists unrelated to League's exhibits was incidental to overall exempt educational purpose).

### 3. CST's Overriding Rationale is to be a Tax-exempt Organization

If CST is to be found tax-exempt, it must be because archiving is its primary purpose and archiving LRH's words is an exempt activity. Further, the court must find that holding the options and receiving LRH's estate are merely incidental to CST's existence. Instead, the court finds that the impetus behind CST was not archiving, charity, or even religious education, but rather was tax planning. Nothing about CST is consistent with its adopted posture as a simple document repository. A number of inevitable inferences from the record, unanswered by CST, lead to this conclusion.

First, there is the plain linkage between CST and the dissolution of CSC, as well as the difficulties Scientology as a whole was having in 1982 with the IRS. Before the creation of CST, CSC served Scientology as a tax-exempt entity. When it became apparent that CSC was likely to lose this status, LRH and the Scientology management restructured both the financial and the ecclesiastical organization of Scientology. CST was created in 1982, during the CSC litigation. It was founded by four non-Scientologist lawyers and Lyman Spurlock, President of CST and former personal employee of LRH, in the wake of CSC's dissolution.

Sartre wrote that "Man is not the sum of what he has but the totality of what he does not yet have, of what he might be." In like fashion, the court is struck by the centripetal force that will be generated should CST obtain tax-exempt status, and should it choose to exercise its option to take over assets from RTC. Armed with the trademarks and publishing rights, and with tax-exempt status, CST will be poised in the center of all of Scientology's financial resources, in position to exert a strong gravitational force on Scientology's income-producing assets.[43] If CST were exempt as a church, it would be virtually insulated from public view, since it would not be required to file an annual return. I.R.C. § 6033(a)(2)(A)(i). If CST were to qualify as a religious organization, it would be responsible for filing only an informational return. I.R.C. § 6033(a).

If CST succeeds in its quest for exempt status, it will control the trademark and publishing rights to all of LRH's works.[44] Those rights constitute most of Scientolo-

---

**42.** Heisenberg postulated that it is impossible to determine at the same time both the position and velocity of an electron.

**43.** CST states that it would never seek to control these assets, or use them in any way inconsistent with the stated religious purposes of Scientology. CST has provided only conclusory statements of its own officers as evidence of CST's intentions. The court in *People of God Community v. Commissioner,* 75 T.C. 127, 132 (1980), found similar conclusory assertions unpersuasive and insufficient to carry petitioner's burden

of proof. Moreover, CST has stated on at least one occasion that "it will exercise its options and acquire the marks and materials." DPFF 61.

**44.** It is no answer to say that the court's concern is with potential developments—that the court is merely speculating. There is nothing speculative about LRH's will, the denial of RTC's exemption, and the value of the marks and copyrights. The culmination of the events set in motion by LRH lacks only the court's sanction.

gy's income-producing property. The trademarks and publishing rights are the source of the Advanced Technology from which all income production ultimately flows. Books and tapes must be orthodox. Provision of auditing services is impossible without authorized books, tapes, and E-Meters. These materials produce money in sufficient quantities to allow CSI to hold millions of surplus dollars in its central reserve account. The potential for abuse of the options and copyrights therefore is considerable. CST would not be obligated to donate the money to other non-profit groups, or even to contribute it to Scientology's own central reserves. In fact, once CST has built its archiving facilities, its expenses should decline dramatically, but it will still control millions of dollars worth of income-producing assets.

Next there is the dissonance between the stated, limited purposes of CST on the one hand, with the far reaching implications of the potential financial control over Scientology built into LRH's tax planning. CST has already demonstrated that it can perform its archiving activities on the largesse of other Scientology organizations. Thus, the argument that CST must be self-sustaining is without merit. Its insistence that it was intended to be independent is unpersuasive because, as currently structured, it is not. If the true motivation behind CST were to build an archive, it would have been a simple matter to incorporate an organization and arrange for financing through the central reserves, or to have all Scientology churches contribute to funding the archive, or to have some other straightforward financing scheme.

What other possible purpose could there have been for funneling LRH's estate to an organization with such a nominally limited

and innocuous function unless it was the hope that Scientology had achieved the holy grail—an organization with unassailable tax-exempt credentials, yet in control of the income from the myriad sources within Scientology? [45]

This concern is exacerbated by the fact that CST will receive nothing from LRH's estate if it is not deemed tax-exempt. Thus, it appears that despite the stated importance of its archives to the Scientology religion, they were apparently not worth supporting unless they generated a tax exemption. Protecting the use of Scientology trademarks and copyrights is also apparently not worth doing if it will not be done by a tax-exempt organization.

Conditioning the receipt of property on obtaining tax-exempt status is "an element that indicates the possibility, if not the likelihood, that the for-profit corporations were trading on such status." *Est of Hawaii v. Commissioner,* 71 T.C. 1067, 1080 (1979), *aff'd,* 647 F.2d 170 (9th Cir.1981); *see also McGahen v. Commissioner,* 76 T.C. 468, 480 (1981), *aff'd,* 720 F.2d 664 (3d Cir.1983); *Basic Bible Church v. Commissioner,* 74 T.C. 846, 850 (1980), *aff'd, Granzow v. Commissioner,* 739 F.2d 265 (7th Cir.1984). It becomes apparent that "the sole reason for incorporating the Church and transferring the royalty rights to the book was an attempt to avoid taxes whereby royalty income would be exempt and any contributions would generate a deduction." *Miedaner,* 81 T.C. at 280 (footnote omitted).

CST is linked by a cat's cradle of connections to RTC, CSI, and through them, to the rest of Scientology, thereby belying its claim of disinterest in the activities of other organizations. This fact, coupled with the commercial character of much of Scientolo-

---

**45.** Plaintiff has argued that the intention of CST's founders is irrelevant to the determination of CST's status. That is, as long as CST's primary purpose was religious, and it otherwise met the requirements of I.R.C. § 501(c)(3), private motives, in this case the advancement of interests of other non-exempt organizations, would not be relevant. Just as genuinely charitable intentions will not save a commercial undertaking from being commercial, CST argues that commercial intentions will not transform a

charitable undertaking into an uncharitable one. *Scripture Press Found. v. United States,* 152 Ct.Cl. 463, 469–470, 285 F.2d 800, 804 (1961), *cert. denied,* 368 U.S. 985, 82 S.Ct. 597, 7 L.Ed.2d 523 (1962). This argument is flawed because it assumes CST's primary purpose was religious. Lacking this premise the argument is irrelevant. The motives of the founders will be considered to the extent they illuminate CST's function and purpose.

gy, the difficulty that its management churches have had with tax exemption, Scientology's virtually incomprehensible financial procedures,[46] its scripturally-based hostility to taxation, the timing of CST's genesis and finally plaintiff's enormous potential for both accumulating wealth and bestowing shelter from taxation, inevitably lead to the conclusion that archiving is not plaintiff's "exclusive" or even chief purpose. The inference is inescapable that CST is merely the latest incarnation of the on-going effort of Scientology as a whole to shelter income from taxation. Consciously or not, CST's organizers reflected an awareness of the truth of Goethe's maxim that "one must be something to be able to do something." The court concludes that CST's real function was to be rather than to do.

### C. CST's Lack of Cooperation with the IRS

■ The court notes an independent basis for rejecting the application. The plaintiff had to demonstrate to the Commissioner, and bears a related burden of proof here, that it is entitled to be exempt from paying taxes. In that connection, it has to be observed that CST's participation in the administrative process reflects a level of hostility and uncooperativeness that is inconsistent with removing doubts. Numerous courts have upheld the denial of an exemption on the basis of an organization failing to provide information requested by the IRS. In denying an exemption to the Founding Church of Scientology, the court noted, "[N]othing we have found in the record dispels the substantial doubts the court entertains concerning [the plaintiff]. Since plaintiff has failed to meet its burden of proof, we hold therefore that a part of the corporate net earnings was a source of benefit to private individuals." *Founding Church*, 188 Ct.Cl. at 500, 412 F.2d 1197; *Basic Unit Ministry of Alma Karl Schurig v. United States*, 511 F.Supp. 166

(D.D.C.1981), *aff'd*, 670 F.2d 1210 (D.C.Cir. 1982); *see also National Ass'n of American Churches v. Commissioner*, 82 T.C. 18 (1984); *World Family Corp. v. Commissioner*, 81 T.C. 958 (1983); *People of God Community v. Commissioner*, 75 T.C. 127 (1980).

The court has referred above to a number of instances in which CST was less than forthright in its dealings with the IRS. Its refusal to provide information even when repeatedly requested, combined with the IRS's experience with other Scientology organizations, made it reasonable for the IRS not simply to accept at face value CST's contentions that it was independent of the Scientology hierarchy, and to probe further. CST failed to respond substantively to the IRS's questions on a sufficient number of occasions during the administrative proceeding.

This behavior is not only understandable from a Scientologist's viewpoint, it is "scripturally" mandated. In HCO Policy Letter of 26 December, 1966, LRH instructed his executives (high church officials) in "Methods of Balking" when faced with a tax investigation. This includes the advice, "Never give such persons access to persons high up in the org—or unit. Turn such over to special personnel who can get the business over with at once and get the agent off the premises soon." HCO Policy Letter of 18 February, 1966 deals with "Attacks on Scientology," and LRH states "Groups that attack us are to say the least not sane ... These people who attack have secrets. And hidden crimes. They are afraid." Thus, concludes the scripture, the way to deal with these "mad" people is by attacking first, and blankly refusing to cooperate. Finally, HCO Policy Letter of 3 February 1966 states, "ALL OUTGOING MAIL to attorneys, tax cruds, the alleged government, the Council, etc.... must be

---

**46.** The court notes that HCO Policy Letter of 15 May, 1968 gives the following instructions regarding explanations of an org's general liability fund: "Refuse to breakdown the calculations on how the fund is computed if demanded by an insurance inspector or tax collector, instead obtain an estimate of coverage costs from brokers recommended by Legal WW, to confirm our cost assignment to fund."

sent to the Legal Officer BEFORE MAIL-ING...." [47]

The theological hostility to paying taxes evident in the scriptures also supports the close attention of the IRS. Although CST is fully entitled under the Constitution to believe that paying taxes is spiritually wrong, it cannot then be surprised that its position invites scrutiny.[48] Just as a group which advocates violence will attract police observation, a group which has historically displayed reluctance to pay taxes can expect the watchful eye of the IRS. Furthermore, CST's right to oppose and resent the IRS does not change the fact that helping non-exempt groups avoid paying taxes is not the basis for an exemption. Religious belief cannot be used as a magic wand to transform tax avoidance into a tax exemption. *Ecclesiastical Order of ISM of AM, Inc. v. Commissioner*, 80 T.C. 833 (1983), *aff'd*, 740 F.2d 967 (6th Cir.1984), *and cert. denied*, 471 U.S. 1015, 105 S.Ct. 2018, 85 L.Ed.2d 300 (1985). Nor does it excuse CST from dispelling the Commissioner's doubts about it. The IRS was thus justified in finding that CST had failed to carry its burden of proving its exempt status.

## CONCLUSION

The court does not question the sincerity of the beliefs of those who practice Scientology. Nor does the court hold that Scientology is not a religion. Plainly it is. The limited issue before the court, however, is whether CST has met its obligation of demonstrating that the Commissioner's decision was erroneous. It has not. There was sufficient evidence in the administrative record to support the Commissioner's finding that CST has not shown itself to be an exempt organization under § 501(c)(3).

The Clerk is directed to dismiss the complaint.

## APPENDIX

## GLOSSARY OF ABBREVIATIONS

**A**
AO–SH—Advanced Organizations—Saint Hill
ASI—Author Services, Inc.

**B**
BPI—Bridge Publications, Inc.

**C**
CLO—Continental Liaison Office
CSC—Church of Scientology of California
CSFSO—Church of Scientology Flag Service Organization
CSI—Church of Scientology International
CST—Church of Spiritual Technology

**D**
DPFF—Defendant's Proposed Finding of Fact

**E**
E–Meter—Electro Meter

**F**
FBO—Flag Banking Officer
FBO INT—Flag Banking Officer International
FEO—Finance Enforcement Officer
FP—Financial Planning

**H**
HCO—Hubbard Communications Office
HCO PL—Hubbard Communications Office Policy Letter

**I**
IPT—International Publications Trust
IRS—Internal Revenue Service

**L**
LRH—L. Ron Hubbard

---

**47.** See also, HCO Policy Letter, 25 June 1967, states "[t]he real stable datum in handling tax people is NEVER VOLUNTEER ANY INFORMATION." And from the same letter, "Right now there is a lot of tax yap. And it is being set up to clobber Scientology with huge tax bills in England and the U.S."

**48.** Tax exemptions are a matter of legislative grace, and organizations seeking a tax exemption "are expected to follow the reasonable standards enacted by Congress and devote themselves exclusively to the pursuit of religious purposes." *Parker v. Commissioner*, 365 F.2d 792, 795 (8th Cir.1966), *cert. denied*, 385 U.S. 1026, 87 S.Ct. 752, 17 L.Ed.2d 674 (1967).

**M**
MCCS—Mission Corporate Category Sort-out
**N**
NEP—New Era Publications
**O**
OTC—Operation Transport Corporation, Ltd.
**P**
PPFF—Plaintiff's Proposed Finding of Fact
**R**
RTC—Religious Technology Center
**S**
SOR—Sea Organization Reserves
**W**
WDC—Watchdog Committee
WW—World Wide